**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ALTON CRAIN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-16-CV-408-XR |
| | § | |
| CITY OF SELMA, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

On this date, the Court considered Defendants City of Selma, Mayor Thomas Daly, James Parma, Ken Roberts, Johnny Casias, and Larry Verner's Motion for Summary Judgment (docket no. 107), and the opposition thereto. After careful consideration, the Court grants the motion.

**Procedural Background**

Plaintiff Alton Crain filed this lawsuit on May 3, 2016, after a property offered for sale by the City of Selma was sold to another bidder. Crain alleged that he was treated unfavorably during the bid process based on his race (African American) and therefore asserted claims that the City, certain City of Selma employees and City Council members, and two lawyers who represent the City violated the Fair Housing Act.

On August 9, 2016, the Court dismissed all claims against Defendant Charles Frigerio, the City's outside litigation counsel. Docket no. 25. On March 3, 2017, the Court dismissed all "spoliation of evidence claims" and claims based on criminal liability, dismissed the fraud and

1

negligent misrepresentation claims against Defendant Marc Schnall, the City Attorney, and dismissed the claims against the City of Selma without prejudice for failure to sufficiently allege a basis for *Monell* liability. Docket no. 37. Plaintiff filed an Amended Complaint and, at a status conference on June 29, 2017, the Court allowed Plaintiff to add a claim that he was unlawfully denied a place on the ballot for City Council in the May 2017 election. Plaintiff filed his Amended Complaint adding that claim on July 12, 2017.

On December 15, 2017, Defendants filed a Motion for Summary Judgment (docket no. 64).  The Court held a hearing on the motion, and then issued a written order granting in part and denying in part the motion on January 23, 2018. The Court granted the motion on the legislative immunity defense and dismissed Plaintiff's claims against City Council members Kevin Hadas, Harry Greene, Kenneth Harris, and Philip Sweeney, who voted as members of City Council. The Court also granted the motion on the qualified immunity defense on the individual claims against Marc Schnall, the City Attorney, and Robert Klaerner, the City's IT Director, and dismissed those claims. The Court otherwise denied the motion, without prejudice to re-urging.

Shortly thereafter, the Court granted Plaintiff's motion to appoint counsel to afford Plaintiff the best opportunity to develop and present his case. Docket no. 87.[1] A new Scheduling Order was entered, and additional discovery was taken. On February 22, 2019, Defendants filed the Motion for Summary Judgment now under consideration.  The City moves for summary judgment on all claims on the basis that there is no custom or policy under *Monell* and there is no evidence that race played any part in the City's decisions at issue. Defendants Mayor Thomas Daly and Councilmember James Parma additionally move for

---

[1] The Court thanks appointed counsel for accepting the appointment and for their diligent work on this matter.

summary judgment on the basis of legislative and qualified immunity. Last, the remaining employees of the City of Selma, Ken Roberts, Johnny Casias, and Larry Verner, assert qualified immunity. Plaintiff Crain has responded in opposition. The Court now examines the motion.

### Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand a motion for summary judgment, a plaintiff must show that there is a genuine issue for trial by presenting evidence of specific facts. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 n.4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 151 (2000).

## Fair Housing Act Claim

A. Factual Background

Plaintiff Alton Crain purchased his home located on Alton Boulevard in the City of Selma in 2007. The City owned the lot immediately adjacent to his home, and Plaintiff was interested in purchasing it. Plaintiff expressed his desire to purchase the lot to the City's leadership and elected representatives, including Assistant City Administrator Johnny Casias (Hispanic) and Mayor Tom Daly (Caucasian).

In 2014, the City decided to sell certain excess property, including the lot in question. Nine parcels were put up for sale by sealed bid process, and the lot adjacent to Plaintiff's home was Parcel 5. It was the City's intent that all bids be submitted under seal pursuant to Texas Local Government Code § 272.001, which is a method of sale permitted by Texas Local Government Code § 253.008. *See* TEX. LOCAL GOV'T CODE § 253.008 ("The governing body of a municipality may sell real property owned by the municipality by public auction or by sealed bid under Section 272.001."). Section 272.001 provides that "before land owned by a political subdivision of the state may be sold . . ., notice to the general public of the offer of the land for sale or exchange must be published in a newspaper of general . . . [and] the notice must include a description of the land, including its location, and the procedure by which sealed bids to purchase the land or offers to exchange the land may be submitted." TEX. LOCAL GOV'T CODE § 272.001(a).[2]  Thus, the municipality is required to develop a procedure by which sealed bids may be submitted, and the City did so.

---

[2]  Section 272.001 applies to both counties and cities, but section 263.007 also provides an alternative procedure for counties to conduct sealed bids, and requires them to obtain an appraisal and determine a minimum bid amount based on the appraisal.  Neither the chapter applicable to cities (Ch. 253) or counties (Ch. 263), nor the chapter applicable to both (Ch. 272), sets forth any required procedures for maintaining or opening sealed bids once submitted. Although this Court referenced Texas Local Government Code § 271.026 governing the opening

4

The City Council approved Resolution 111314-01 on November 13, 2014, which set forth the City's intent to sell the property pursuant to § 272.001 and the rules and procedures governing the City's receipt of sealed bids. The Resolution required each sealed bid to specify on the outside of the sealed bid which parcel the bid was for, and to be delivered to City Hall, attention Kenneth E. Roberts, City Administrator, not later than 5:00 p.m. on December 19, 2014, a Friday. Pl. Ex. 6 (resolution). The City issued a public notice about the auction, which was prepared by City Attorney Marc Schnall. In the notice, the City offered for sale the parcels "to the party offering the highest and best all-cash bid," but reserved the right to reject offers for any parcel for any reason. Pl. Ex. 6 (public notice); Roberts Aff. at 2; Roberts depo. at 59. The City Council had sole decisionmaking authority. Casias depo. at 15.

Plaintiff was eager to submit a bid for the property, and appeared at City Hall on the afternoon of December 19, 2014 to meet with City Administrator Ken Roberts. Plaintiff alleges that he had a pre-bid conference scheduled with Roberts and Casias at 4:15 p.m. Docket no. 1 at 11. Assistant City Administrator Johnny Casias was also present at the meeting, but testified that he "just happened to pop in." Casias depo. at 19. Plaintiff asserts that he asked if other bids had been submitted for Parcel 5, and was told that two bids had been submitted, but neither conformed to bid procedures. Crain Decl. ¶ 2. Thus, Plaintiff believed that his bid would be the only conforming bid, so long as no additional bids were submitted.

---

of sealed bids in competitive bidding in certain public works contracts at a prior status conference, that section does not expressly apply to sales of land.  Thus, there appears to be no statutorily mandated procedure for opening sealed bids in conjunction with the sale of real property by a municipality.  Plaintiff's allegation that "[p]olicy states that all bids were to remain with City Administrator Kenneth Roberts and are opened in the presence of the City Council" (see docket no. 1 at 9) is unsupported.

Plaintiff further testified that Roberts advised Plaintiff to consult the appraised value of the Bexar County Appraisal District (BCAD) in setting his bid amount, and Plaintiff submitted a bid for the property at 3% above appraisal value.[3] Crain Decl. ¶ 2. Roberts filed an Affidavit stating that Plaintiff asked him what amount to bid, and Roberts replied that he was unable to give that information but suggested that a reasonable person would go to BCAD and find out the appraisal value and "then let his conscience be his guide as to how much to go above the appraised value." Roberts Aff. at 2. He also testified at his deposition that, if someone were to come to him and ask, "Where do you think I should start?", he would say "why don't you look the property up on Bexar Appraisal District and use that as your start point and let your conscience be your guide after that." Roberts depo. at 15. Roberts testified that he gave the same advice to bidder Richard Owen (Caucasian). Roberts depo. at 17. Roberts testified that, by default, if any bid fell below the BCAD appraisal, the City would not sell it. Roberts depo. at 16.

However, unbeknownst to Plaintiff or any of the public, the City did not intend to use the BCAD value in determining fair market value for the properties or evaluating bids. Instead, the City had decided before offering the properties for sale, on the advice of City Attorney Marc Schnall "and at the advice of City Council," to hire Stouffer & Associates to provide current market valuations for the properties. Roberts depo. at 17; Casias Aff. at 3. City Engineer Larry Verner provided information to Stouffer to assist in the appraisal process. The Stouffer appraisals were contained in a report dated August 11, 2014 (three months before the City authorized the sale via the Resolution), and the appraised market values exceeded those in

---

[3] Casias denied ever communicating to any prospective bidder that their bids would need to hit a certain price to be considered and denied ever telling Plaintiff to try and get a bid at 3-10% higher than the BCAD value. Casias depo. at 18-19.

the BCAD appraisals for all lots except Parcel 4. The BCAD value for Parcel 5 was $16,020, while the Stouffer value was $19,250.

Thus, City officials decided not to accept any bids below the Stouffer & Associates valuation, with Casias characterizing it as a "municipal internal decision . . . to ensure accurate and current fair market values regarding the properties." Casias Aff. at 3. Roberts testified that he never told Plaintiff or any other bidders that Stouffer had been hired to provide an independent valuation, and the valuations were not provided to any bidders. Roberts depo. at 35-36. Thus, the undisputed evidence is that no bidders were informed of the Stouffer valuations or informed that bids below the Stouffer values would not be accepted, and none of the written information provided to the public so stated. Further, none of the written information provided to the public by the City stated that bidders should be guided by the BCAD values or that bids below the BCAD values would not be accepted. Neither the City Resolution nor the Public Notice of the sale stated that the City was relying on BCAD, Stouffer, or market value for approving a sale. They stated only that the City offered the parcels to the party with the highest and best all-cash bid, and that the City reserved the right to reject a bid for any reason. Although Roberts told bidders to use BCAD as a "starting point," he did not state that BCAD values would determine whether a bid was accepted or rejected, and he apparently gave this information to any bidder who asked, including at least Plaintiff and bidder Owen.

As noted, Plaintiff asserts that, during his meeting, Roberts and Casias told him that two other bids for Parcel 5 had been received, but they were submitted improperly. Crain depo. at 34-35. Roberts testified that he would not have told Plaintiff that other, non-

7

conforming bids had been received because that was outside his area of expertise. Roberts depo. at 34-35. Casias had no recollection of telling Plaintiff that non-conforming bids had been submitted, and stated that he would not have had any knowledge at that time whether any bids were nonconforming, because he had not opened them. Casias depo. at 20-22. However, he admitted that he would have been able to discern whether bids were nonconforming for failing to indicate the parcel number on the outside. Casias depo. at 21-22. For purposes of summary judgment, the Court must assume that Plaintiff was told that two nonconforming bids had been submitted. Plaintiff surmises that the two bids for Parcel 5 that had been allegedly submitted improperly failed to state the parcel number on the outside and were submitted by Jose Bustos and Richard Owen, the two others who bid on Parcel 5.

Plaintiff asserts that, during the meeting, after Plaintiff indicated his intent to submit a bid in excess of the BCAD evaluation, Casias received a phone call and "rushed out" of the meeting. Based on the fact that Plaintiff saw Casias with Jose Bustos shortly after, Plaintiff surmised that the phone call was from Bustos. However, there is no summary judgment evidence that the call was from Bustos, and the uncontroverted evidence is that it was not. Casias testified that the phone call was not from Bustos, since he had never met Bustos at the time. Casias depo. at 23; Casias Aff. at 2. Bustos stated that Casias did not call him on December 24 and that he did not know Casias before he met him that day. Bustos Aff. at 2. Casias has produced his phone records to show that no phone calls were received from Mr. Bustos. Casias Aff. Ex. A. Although not all the phone numbers on the call log are identified, Plaintiff has not produced any evidence indicating that any of the phone numbers belonged to

Jose Bustos. Thus, at this time, the only evidence before the Court is that Bustos did not call Casias that day, and this evidence is undisputed.

Plaintiff handed his bid directly to Ken Roberts and then left Roberts's office. As he exited the office into the lobby, Plaintiff observed Casias, who Plaintiff stated had "urgently" exited his meeting after receiving the phone call, speaking with a couple in the lobby. This couple was Jose Bustos and his wife. Plaintiff thought the timing was "interesting" and "odd," so he stayed to observe. Crain depo. at 28. The substance of the conversation between Casias and Bustos is disputed.

Casias admits that he spoke with Jose Bustos and his wife, who were submitting a bid for Parcel 5. Casias 2018 depo. at 15-16, 49. Casias testified that he had not met or seen Bustos prior to this conversation. *Id.* at 16. Casias stated that he was asked by a City Utility Clerk if he could speak to Bustos about the bidding process, so he met briefly with him and his wife. Casias Aff. at 2; Casias depo. at 27. Casias states that Bustos asked for a copy of a map showing the parcels of land that were up for bid, and that he "made a copy of the map and briefly stepped out and handed him the map copy." Casias Aff. at 2. Casias states that Bustos also asked a question regarding a legal word that was included in the description of Parcel 5 and he "got the impression he was wondering if Parcel 5 included the full lot or only a portion of the lot." Casias Aff. at 2; Casias depo. at 28. Casias further states, "Mr. Bustos['s] last question related to whether his contact information was required on the outside of the bid envelope. I answered his questions and gave him no further information." Casias Aff. at 2.

Plaintiff states that he heard Casias tell Bustos and his wife to write the parcel number on the outside of the bid and to bid "market value" for the properties at issue, contrary to

Roberts' advice to Plaintiff to consult BCAD appraised values in setting the bid amount. Crain depo. at 26, 29. Plaintiff states that he then spoke with Bustos, who told Plaintiff that Casias had given him instructions on how to bid properly for Parcel 5. Plaintiff believed that Bustos had submitted an improper bid that failed to note the parcel number on the outside (one of the two bids he alleges that he was told had been improperly submitted), and that Casias had told him how to correct the improper submission, and had actually exchanged the improper bid for a new, proper bid. Plaintiff contends that he witnessed such a bid exchange, and believes that such a bid exchange would have been captured on lobby video.

Casias states that he "did not give Mr. Bustos any bidding amount suggestions for parcel no. 5 or any other parcel up for bid. I did not receive any bids from him, nor did I return any bid to him. I only handed Mr. Bustos a copy of the City Map showing the parcels up for bid. I can also state that Mr. Bustos submitted only one bid and never submitted a revised bid." Casias Aff. at 2; Casias depo. at 29 (stating that Bustos did not hand his bid to him). Casias denied telling Bustos to write the parcel number on the outside of the bid and denied exchanging any previously submitted bid. Casias depo. at 30. Casias attests that Bustos submitted his bid to the City Utility Clerk, not to himself. Casias Aff. at 2.

Mr. Bustos submitted an Affidavit stating that he went to City Hall "near closing time" on December 19 with his wife to submit a bid for Parcel 5 and other parcels. Bustos Aff. at 2. He attests that he had two questions, and that he spoke to Assistant City Administrator Casias and asked him for a copy of a map showing the parcels, and Casias made a copy of the map and provided it to him. Bustos Aff. at 2. Bustos states that his second question was if there was a starting bid amount for each parcel, and that Casias told him he could not give him any

information about what amounts to bid for the parcels being sold. Bustos Aff. at 2. Bustos states he submitted his bids close to 5 p.m. on December 19. Bustos Aff. at 2. Bustos states that he submitted only one bid for Parcel 5 and never submitted a second, changed bid. Bustos Aff. at 2. Bustos states he never met Casias before their conversation on December 19, and that he recalled Plaintiff approaching him and telling him they were bidding on the same parcel. Bustos Aff. at 2.

Thus, what transpired between Casias and Bustos is in dispute. However, according to Plaintiff, Casias told Bustos to use market value and to write the parcel number on the outside of the bid, and Plaintiff believes he witnessed a bid exchange wherein Casias gave Bustos his nonconforming bid back and accepted a second, corrected bid. Based on what he believed he heard and witnessed, Plaintiff became concerned that his would not be the only conforming bid. He called Roberts back, withdrew his initial bid, and directly submitted to Roberts a second bid at 10% above the BCAD value. Crain depo. at 34.[4] Because he submitted it directly to Roberts, Plaintiff's bid is not stamped as "received" by a clerk. Roberts states that he allowed Plaintiff to withdraw his first bid and submit a second bid because the deadline had not passed and he wanted to give Plaintiff every advantage so that he could not say he was mistreated. Roberts Aff. at 2; Roberts depo. at 27, 33-34. Roberts did not know what Plaintiff had bid either time.[5]

Bustos submitted the highest bid of $24,000 for Parcel 5. He also submitted the highest bid for Parcel 8, though it was below both the BCAD and Stouffer values. As noted, Bustos

---

[4] The BCAD value was $16,020, and Plaintiff submitted a bid of $17,622. This was below the Stouffer appraised value of $19,250.

[5] Roberts testified that he also had a conversation with Bustos, in which Bustos asked if there were any back taxes on a parcel, and Roberts told him no. Roberts depo. at 24. Roberts testified that he did not know Bustos before that. Roberts depo. at 25.

states that he submitted his bids on Friday, December 19, though he does not state to whom. Plaintiff contends that he witnessed Bustos submit his corrected bid for Parcel 5 to Casias on December 19, though Casias denies this and asserts that video shows Bustos submitting his bid to the utility clerk. Bustos's bid is stamped "received" at 4:49 p.m. on December 22, the following Monday. This stamp is the same style stamp as on Owen's bid, and the similarity indicates that the bid was submitted to the Utility Clerk. As noted, Plaintiff's bid has no "received" stamp because he did not submit it to the Clerk, but to Roberts. The fact that Bustos's bid is stamped tends to cast doubt on Plaintiff's belief that Bustos submitted his bid to Casias, and supports the fact that it was submitted to the Utility Clerk. It seems highly unlikely that Casias would have received Bustos's bid on Friday afternoon and then have it stamped "received" at 4:49 on Monday by the clerk. Further, it seems likely that Plaintiff simply witnessed Casias giving Bustos a map, which both Bustos and Casias state occurred, rather than a bid exchange.

Plaintiff's Affidavit and briefing in response to the motion for summary judgment does not assert that Plaintiff witnessed a bid exchange, as he had insisted occurred previously. Rather, it states only that Plaintiff heard Casias tell Bustos that he would be permitted to resubmit his bid, and asserts that Bustos's bid was nonconforming because it was stamped December 22. Crain Aff. ¶ 4. Thus, Plaintiff contends (or has contended) both that Bustos submitted his corrected bid to Casias on Friday afternoon and that Bustos's bid was "nonconforming" because it was stamped received on December 22, after the December 19 deadline, and was untimely. There is no direct evidence of how the bid came to be stamped December 22, but all the evidence other than the stamp – including Plaintiff's own testimony

about the bid exchange -- indicates that Bustos did in fact submit his bid on December 19. As noted, Bustos stated he submitted his bid on Friday December 19. Casias testified that he watched a video showing the Bustoses submitting their bid to clerical staff at 4:40 on December 19. Casias 2018 depo. at 50-51.[6] This video has not been submitted, and because the Bustoses submitted a bid for Parcel 5 and a bid for Parcel 8, it is unknown whether the video showed Bustos submitting both bids or only a bid for Parcel 8. There is no evidence about the date/time stamp on Bustos's bid for Parcel 8, and whether it is also stamped received on December 22.

Casias testified that sometimes on a Friday, the clerks will switch the stamp date over to the next business day. Casias depo. at 36-37. Roberts also testified that sometimes a clerk may advance the stamp date. Roberts depo. at 28, 53-54. No one with personal knowledge testified about whether this occurred, but it offers some explanation for how the bid was stamped December 22, when the testimony is that it was received on December 19.

Roberts testified that all bids received by the utility clerk were taken to Roberts's office, and were kept in a locked drawer of his desk in one large envelope. Roberts depo. at 54. Roberts testified that he thought the last bid was received on Friday December 19 and did not recall any bids being brought in on Monday. Roberts depo. at 54-56. He affirmatively stated that he did not accept any bid from any employee on Monday the 22nd. Roberts depo. at 56. He stated that he would have known something was wrong if a bid was brought to him on Monday. Roberts depo. at 55-56. The bid envelope was taken to Marc Schnall, City Attorney, on Monday December 22, and no one else looked at the envelope during that time period.

---

[6] Casias also testified that he had no personal knowledge of when Bustos submitted his bid, because he did not hand it to him. Casias 2018 depo. at 37.

Roberts depo. at 55-56; Schnall Aff. at 1. Roberts did not think it was possible that the bids were taken to Schnall's office at 4:49 on Monday December 22. Roberts depo. at 55.

Because Plaintiff was suspicious of Casias's interactions with Bustos, he emailed Casias and Roberts on December 21 expressing his concerns about possible bid tampering or rigging. Casias depo. at 38; Roberts depo. at 42; Pl. Ex. 8 (email called "Parcel 5 Bidding Concerns" sent December 21, 2014). He wrote that he had a concern "regarding suspicious timing and bidding instructions in the city hall lobby in the final bidding moments Friday December 19th at approximately 4:50 p.m." He noted that Casias and Roberts had said that "a few people had submitted bids to you that were not in accordance to the posted bid procedure" and "bids submitted incorrectly should not be a qualified bid and discarded," and he wanted to know "if the Spanish couple bidding on parcel #5 after I met with you two, was one of those bidders the city contacted after they submitted bids incorrectly by not identifying the parcel # on the outside of the envelope." He stated he was troubled "because it appears that the couple was urged by Mr. Casias to resubmit a bid" and that it appeared "that Mr Casias was involved because he gave the correct bidding instructions and directives to the couple in my presence at the city hall lobby door."

He wrote, "My concern is that submissions in error particularly for parcel #5 in essence were given favor because the bidders were contacted and permitted to resubmit bids twice while those who followed the bidding rules were not given the same process"' and noted that he "spoke to the couple submitting or resubmitting a bid for parcel #5." He asked that bids by bidders who did not follow instructions for parcel #5 be void because "the city made contact with the bidder advising resubmitting (interfering with the bid process)." He further states that

14

his bid would have won (as the only conforming bid) "if the city had not contacted bidders before time expired" and city employees should not "interfere with the posted procedures by correcting bidders." Later in the email he states that he asked during his initial meeting with Casias and Roberts if there were any bids for parcel #5 and was told "NO bids indicating interest in parcel #5" by Casias. But then he heard Casias tell the Bustoses to "place the parcel number on the envelope" and after hearing this, he called Roberts back to the door and submitted his second, higher bid "only because I was shocked to see instruction being given to the Spanish couple for the same parcel I spoke to the two of you about it and I was assured that I was the only properly submitted bid for parcel #5."

Mayor Tom Daly went to Plaintiff's house to discuss what had happened. Daly depo. at 5. Mayor Daly emailed Plaintiff on December 24 stating, "Had a long talk with Mr. Casias today and conveyed our conversation and your concerns. I have advised him to contact you on Friday and discuss this further. I hope you both can come to a positive outcome. I will continue to stay involved as much as I am able to." Apparently at some time, Casias called Plaintiff and explained the conversation. Plaintiff thanked him but stated that he felt he should be communicating with Roberts because "he was the person who gave bidding instructions down to the percentage" and that his concerns persisted.

Plaintiff complains that, despite his bringing potential bid tampering to their attention, City officials did not investigate. Casias stated that he and Roberts discussed the issue and "that was the extent of the investigation." Casias depo. at 39. Councilmember Harry Green admitted he did not investigate or call a special meeting. Pl. Ex. 32 No. 13, 14. Roberts notified the Texas Municipal League to open a file because he thought it would "go to court,"

and asked Marc Schnall if there was any concern, but was told no, so he let it go at that, without conducting further investigation. Roberts depo. at 43, 47.

The bids were to be considered at the City Council's January 8, 2015 meeting. Roberts submitted an Affidavit stating that, after speaking to Marc Schnall, "it was decided that I would submit all sealed bids to him [Schnall] on Monday December 22, 2014, and that he would open the bids and compile the bidding information for City Council." Roberts Aff. at 2. Roberts testified that he spoke to Schnall in front of the Mayor and said he wanted Schnall to open the bids as an uninterested third party, and that the Mayor gave his tacit approval by giving a "stage nod." Roberts depo. at 19.[7] Roberts wanted Schnall to provide the information on a spreadsheet so that it was simple and easy to decipher. Roberts depo. at 20, 22. This was not formally approved by the City Council. Hadas depo. at 30.

The still-sealed bids were transported to Selma City Attorney Marc Schnall by City Engineer Larry Verner,[8] and Schnall opened the bids at his law office and then created a summary spreadsheet of the bids received for each property. Schnall Aff. at 2. The spreadsheet indicates the parcel number, the BCAD value, the Stouffer value, the name of the bidder, the bid amount, and whether the bids were conforming. Schnall's spreadsheet reflects three bids for Parcel 5 – a $24,000 bid from Jose Bustos, a $17,622 bid from Plaintiff, and a $8,517 bid

---

[7] There is also evidence that it was decided before bidding occurred that Schnall or someone would open the bids and prepare a bid summary. On December 4, Casias had sent an email to Larry Verner stating that he talked with Marc [Schnall] and they planned that, "After the deadline to submit bids, staff can open the bids and prepare a list of all bids submitted." Pl. Ex. 10. He further instructed Verner to "prepare for sale of properties to be an action item at the January 8th City Council Meeting." *Id.*

[8] There is some mixed testimony on this. Casias states in his Affidavit that City Engineer Larry Verner delivered the unopened sealed bids to Schnall "at the direction of the City Administrator and City Council." Casias Aff. at 4. Roberts testified that Robert Klaerner, the IT director, delivered the bids. Roberts depo. at 37. Schnall, who presumably had personal knowledge of who delivered the bids to him, testified by Affidavit that it was Verner. Schnall Aff. at 2.

from Richard Owen III – and states they were all conforming. Only Bustos submitted a bid for Parcel 5 above the Stouffer appraised value of $19,250.

Although Bustos's bid was stamped "received" on December 22, 2014, Schnall noted it as conforming, indicating (rightly or not) that it was timely submitted. Plaintiff contends that Owen's bid does not indicate a parcel number on the outside, but was marked as conforming. Pl. Ex. 14 (as supplemented at Ex. 36). Bids by two other bidders on other parcels (4 & 6) were noted as nonconforming for failing to note the parcel number on the outside of the sealed bid – two bids by African-American bidder Ernest Banks for Parcel 4 and Parcel 6 and a bid by Hispanic bidders Juan and Nelda Frias for Parcel 4. Bustos also submitted a bid on Parcel 8 for less than both BCAD and Stouffer values, and it was marked as conforming, though as noted the Court has not been given any evidence concerning whether it was stamped received on December 19 or 22. Mayor Daly and Ken Roberts agreed that nonconforming bids should not have been eligible for consideration. Roberts depo. at 23; Daly depo. at 17. *But see* Hadas depo. at 16-17 (Hadas would rely on counsel to determine if a bid was nonconforming and, if so, what the options were).

Schnall gave the spreadsheet and the open bid envelopes to Ken Roberts. Schnall Aff. at 2. The spreadsheet was presented to the City Council at their January 8, 2015 meeting. The Council went into executive session to consider the bids, and Schnall was present at the executive session. Hadas depo. at 36. Plaintiff contends that the City Council and Mayor Daly relied only on the spreadsheet in determining whether bids were conforming so as to warrant their consideration, and the City Council did not review the original bids themselves, despite Crain's warnings of possible bid tampering. However, Roberts testified that the bids were

submitted as attachments to the spreadsheet. Roberts depo. at 25-26. Further, Councilman Greene answered in his deposition on written questions, "To the best of my recollection the bids were presented to the City Council during the January 8, 2015 City Council Meeting." Pl. Ex. 32. Councilman Hadas testified that he saw the actual bids in executive session, and that he saw the envelopes themselves. Hadas depo. at 28-29.

Hadas testified that he asked whether all bids were received on time, and "the consensus [from Schnall, Roberts, and Casias] was yes," though he did not specifically ask about the December 22 stamp on the Bustos bid for Parcel 5. Hadas depo. at 34. He deferred to Schnall's representation that all bids had been received timely. Hadas depo. at 34.

Plaintiff alleges that Owen's bid for Parcel 5 did not have the parcel number written on its outside, and was thus nonconforming, but was listed as conforming on the spreadsheet. Plaintiff complains that this fact was not considered by the City Council. Hadas testified that he did not ask whether all the bids had the parcel number written on the outside. Hadas depo. at 35. However, the envelope provided by Plaintiff as evidence appears to be a large letter-size envelope and it states "Bids" on the outside, indicating that there are likely multiple bids inside the envelope. It is undisputed that Owen submitted bids on all nine parcels, and the spreadsheet describes them all as conforming. Thus, it is unclear whether there were nine properly labeled sealed bids within the large envelope marked "Bids" or whether this was a sealed bid envelope for a bid on only Parcel 5, but lacking the parcel number on the outside. Nevertheless, for purposes of summary judgment, the Court will assume the bid was improperly marked as conforming on the spreadsheet.

The City Council  (Mayor Tom Daly and the City Council members) accepted Bustos's bid on Parcel 5 and awarded him the right to purchase the property. Bustos's bid was the only bid above Stouffer's appraised value for any of the parcels, and thus no other bids were accepted, even where there was only one conforming bid. According to Roberts and Schnall, no other bids were accepted by the City because they were all below the Stouffer appraised value. Roberts depo. at 58-59; Schnall Aff. at 2.

On January 12, Roberts notified Plaintiff that the City accepted a bid of $24,000 for Parcel 5, to which Plaintiff responded, "I will be in touch." On January 16, Plaintiff emailed Daly, Casias, and Roberts stating, "this was the beginning of the process." He asked for certain information, including (1) the name of the organization or office you used after residents bid according to instructions you gave; (2) "why you would post a bidding process to the public and then after you've made errors continue or suddenly want another organization to finish a process you initiated"; (3) "if you shared with the city council the facts that you told residents and bidders to use BCAD and bid 3 to 10 percent above bcad listed values. I believe this information would have been helpful to the council to have known prior to any bidding decisions"; (4) "I would like to request video, audio, and possibly phone communication from the time bidding started until December 19th at 5 pm"; and (5) "I want something official from your office stating how you came to your decision and all parties involved inside and outside not excluding the city council, administrators, and mayor."

On January 22, Plaintiff emailed that he spoke with Bustos and his wife in the lobby on December 19th at 4:45 and "asked about your communication," and stated "they were given instructions on how to bid properly for parcel 5." He further wrote, "Parcel 5 was one of the

bids submitted not in accordance with posted policy. This was communicated to me by you two in my pre bid conference. Both of you shared information about the number of properly submitted bids for parcel #5. The number was 0. This prompted me to bid low 3% to 10% above bcad according to Mr. Roberts instructions. Mr. Roberts not only instructed me but other bidders who I have communicated with. Finally be aware that I spoke with the Bustos family after you two. I witnessed and a camera recorded what I witnessed after my pre bid conference with the both of you." Pl. Ex. 16.

Plaintiff filed a series of public information act requests and a discrimination complaint with the Texas Workforce Commission. Plaintiff wanted to obtain video footage of the interaction between Casias and the Bustoses. Plaintiff demanded that the City preserve video from its City Hall lobby on the afternoon of December 19, 2014 to corroborate his allegation of Casias's "coaching, guidance, and improper assistance" to Bustos, as well as a "bid exchange." There is a video camera located in the hallway outside the office, but it is undisputed that the recording system does not have sound/audio recording. Casias depo. at 20, 47-48. Plaintiff obtained what he says is a modified version of the video during his TWC/HUD complaint process, because it shows "everything" but the interaction in question. Plaintiff alleged that Defendants intentionally destroyed one minute (4:34-4:35) of video, the time when Casias allegedly coached Bustos and conducted a bid exchange. Docket no. 1 at 4. Plaintiff believed his claim before the Workforce Commission failed in part because he could not obtain that footage to corroborate his allegations. *Id.*

There is some confusing testimony about the video and its contents, and the Court has never been presented with or seen any of the video footage. At the June 29, 2017 status

conference, counsel for the City stated that the video had been produced in its entirety, but that portions after the bidding process ended at 5 p.m. were corrupt (the video phases out). Transcript at 14. Counsel stated he had not reviewed the video before the hearing, but believed from his recollection that "you can see Mr. Bustos talking with Mr. Casias." Tr. at 15. However, at Plaintiff's November 2017 deposition, counsel for Selma offered a videotape of "the whole day of the 19th, and it shows [Plaintiff] and the Bustoses. It doesn't actually show Casias coming out." Crain depo. at 35-36. Counsel surmised that you could not see Casias in the video because there is a Christmas tree. Crain depo. at 36-37.

Roberts testified at his 2018 deposition that he reviewed the video footage within a week or two of the events and he could see Casias, but it looked like he was talking to a bench. Roberts depo. at 48-49. However, he stated it had been years since he viewed the video. Roberts depo. at 57. In response, counsel for Defendants Frigerio stated to Roberts in the deposition that the video shows only the Bustoses, and does not show Casias, to which Roberts responded, "Oh really? Well, shows you much I know." Roberts depo. at 57.

The City deposed Robert Klaerner, its Information Technologist/Network Administrator in 2017. Pl. Ex. 28. He testified that he is the sole person with access to pull videos, that he preserved the December 19, 2014 footage on his computer, and that he simply made a copy of what was existing in the computer system. Klaerner depo. at 10-12.[9] He testified that Casias is not visible on the tape and he guessed it was because of the Christmas tree. Klaerner depo. at 11. In his deposition, Casias testified that there is not continuous video

---

[9] Plaintiff has contended that video alteration is obvious from the fact that the video bears two time stamps – one on December 19, 2014 and one on February 3, 2015. But Klaerner explained that the bottom date is the actual time of the recording and the top time is when he made the video. Klaerner depo. at 10-11.

from 4 to 5 pm on December 19 because the system only records when there is movement. Casias 2018 depo. at 42-43.

The Court considered Plaintiff's motion to compel concerning the video on January 23, 2018. Pl. Ex. 27. Plaintiff argued that, although the video system worked on motion detection, there is no way the video would have stopped during the relevant time frame because people were moving in the area throughout that time. Thus, Plaintiff contends, the fact that the interaction and bid exchange, which Plaintiff states he witnessed, is not on the video, must mean that the video has been altered. However, the Court denied Plaintiff's motion to compel, noting that the video contains no audio. The Court will presume that the interaction between Bustos and Casias is as Plaintiff describes for purposes of this motion.

As noted, Plaintiff filed a complaint with the TWC, but his claim was not successful. He filed this lawsuit on May 3, 2016.  In his original Complaint, Plaintiff made numerous allegations, including that Casias actively corrected the bid submitted in error by Mr. Bustos, that "Mr. Roberts encouraged Mr. Owen to correct and resubmit his bid on Parcel #5" and "allow[ed] Mr. Owen to submit two different bids for the same Parcel #5 (one with a time stamp and one without a time stamp)," and that City Attorney Marc Schnall "selectively chose[] which bids would be accepted," did not allow the City Council to review the original bids, and "accepted the White bids as conforming and rejected the African American bid as nonconforming." Plaintiff alleged that White bidders were excused from complying with the posted bid procedures and were assured acceptance and encouraged by City Administrators to resubmit the bid, while African Americans were not given an opportunity to resubmit their bids like Hispanic and White bidders. He relied on the fact that he believed that Bustos and

22

Owen had submitted nonconforming bids failing to note the parcel number on the outside of the sealed bid envelope, but had been contacted and encouraged to submit corrected bids, as well as the fact that African-American bidder Ernest Banks was the highest bidder for Parcel 6, but was not awarded the sale because his bid was noted as nonconforming for failure to indicate the parcel number on the outside of the envelope.

The Court notes that Plaintiff has offered no evidence that Roberts or anyone encouraged Owen, a white bidder, to submit a second, corrected bid. If that were true, that would be inconsistent with Plaintiff's summary-judgment argument and evidence that Owen's bid for Parcel 5 was nonconforming because it did not have the parcel number on the outside, yet was marked as conforming by Schnall (and thus the bid considered by Schnall still failed to indicate the parcel number on the outside of the envelope). Thus, Plaintiff's evidence establishes at best that (1) Casias told Bustos to write the parcel number on the outside of the sealed bid envelope and to use market value, and either (a) allowed Bustos to submit a corrected bid to him on December 19 (though there is no indication how this bid then got stamped received on December 22 or made its way to Roberts's envelope for delivery to Schnall if that is true), or (b) Bustos was permitted to submit a late bid on December 22, which City Attorney Marc Schnall incorrectly marked as conforming and (2) City Attorney Mark Schnall incorrectly marked Owen's bid on Parcel 5 as conforming when it was not, while marking the bid of the only other African-American bidder Ernest Banks as nonconforming for the same deficiency.

Plaintiff thus contends that a Hispanic bidder (Bustos) and a White bidder (Owen) were given preferential treatment over an African-American bidder (Banks) in terms of

submitting non-conforming bids and being allowed to resubmit or having the nonconformity overlooked, and that Bustos further received preferential inside information by being told to use market value. Plaintiff fails to note, however, that Hispanic couple Juan G. and Nelda Frias were also marked as nonconforming for failing to note the parcel number on the outside of the sealed bid envelope. Thus, an African-American bidder (Banks) and Hispanic bidder (Frias) were given the same treatment in this instance.

B. Analysis

Under 3604(b) of the Fair Housing Act, it is illegal "to discriminate against any person in the terms, conditions and privileges of sale . . . of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . ." 42 U.S.C. § 3604(b). Dwelling is defined by 42 U.S.C. § 3602(b) to include "any vacant land which is offered for sale for the construction or location thereon as a residence." Plaintiff claims that he bid on the property with the intent to build a home; this allows Parcel 5 to act as a "dwelling" for the purposes of the FHA. Docket no. 1 at 10; See 42 U.S.C. § 3602(b).

Claims of racial discrimination under the Fair Housing Act are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff establishes a *prima facie* case of housing discrimination (discriminatory treatment) by showing: (1) the plaintiff is a member of a protected class; (2) the plaintiff sought and was qualified to purchase the housing; (3) the defendant denied the plaintiff the opportunity to purchase the housing; and (4) the housing opportunity remained available to other purchasers. *Petrello v. Prucka*, 484 F. App'x 939, 942 (5th Cir. 2012). If the defendant comes forth with a legitimate reason for its decision, a plaintiff survives summary judgment on

a discriminatory intent claim if he establishes (1) a fact issue as to whether the stated reason is pretextual *and* (2) a reasonable inference that race was a significant factor in the decision. *Artisan/American Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009). The protected trait must have been a consideration and played some role in the real estate transaction. *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1556 n. 30 (5th Cir. 1996) (citing *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986)).

The Court will assume that Plaintiff has established a prima facie case. Defendants have come forth with a legitimate reason for the fact that Parcel 5 was awarded to Bustos instead of Plaintiff – that Bustos submitted the highest bid. Secondarily, Defendants contend that Plaintiff's bid would have been rejected even if it was the sole bid because it was below the Stouffer appraised value, just as the other bids on the other parcels were rejected for that reason. Thus, Plaintiff must establish that this explanation is pretextual and establish that race was a significant factor in the outcome.

Even viewing the facts in the light most favorable to Plaintiff -- that Plaintiff was told two nonconforming bids had been submitted for Parcel 5 at his pre-bid conference, that Roberts told Plaintiff to use BCAD value as a starting point, that Casias told Bustos to use market value and to write the parcel number on the outside of the bid and then allowed Bustos to resubmit a corrected bid either on December 19 or December 22, that Schnall incorrectly marked Owen's bid as conforming when it did not conform, and that the City failed to investigate Plaintiff's allegations of bid tampering -- the Court finds that Plaintiff has failed to satisfy his burden because he fails to provide sufficient evidence demonstrating that he was

discriminated against because of race or that any discriminatory treatment resulted in his loss of the sale.

Plaintiff's evidence fails to raise a fact issue on pretext and fails to demonstrate that race was a significant factor in his not being awarded the sale. His underlying theory of discrimination is that Hispanic (Bustos) and White (Owen) bidders were given preferential treatment (inside information, bid correction, and treating nonconforming bids as conforming) that African-American bidders such as himself and Banks were not. But his FHA claim must be analyzed in terms of his specific bid, and whether he was denied the sale of Parcel 5 because of his race. Thus framed, Plaintiff's theory must be that he only lost the sale because Bustos was given an unfair advantage that he was not given – inside information and the opportunity to submit a corrected and/or untimely bid. But this theory ultimately fails because Plaintiff was not similarly situated to Bustos with regard to submitting a corrected or untimely bid, and Plaintiff in fact received the same "inside" information, albeit indirectly.

Plaintiff's claim hinges on disparate treatment, but Plaintiff is not similarly situated to Bustos in terms of being given an opportunity to submit a corrected bid because Plaintiff did not initially submit a nonconforming bid. Thus, he points to Ernest Banks, another African-American bidder, whose bid was noted as nonconforming for failure to note the parcel number on the outside, to provide evidence that Hispanic bidders were given preferential treatment over African-American bidders. But there are several problems with this reliance.

First, being told to write the parcel number on the outside of the envelope is not inside information, as this requirement was clearly listed on the Resolution and the Public Notice. Everyone received this information. Second, there is no evidence that Casias knew that Banks

had submitted a nonconforming bid yet refused to provide Banks information about writing the parcel number or refused to allow a corrected bid. There is no indication whether, had Banks also been at City Hall and spoken to Casias, Casias would have also told him to put the parcel number on the outside and allowed him to submit a corrected bid. As noted, although Plaintiff speculates that Casias reached out to Bustos and perhaps called him about the nonconforming bid, the evidence fails to bear this out. Rather, the evidence indicates that, even if Bustos had submitted a nonconforming bid, he then had a fortuitous encounter with Casias in the lobby and was given information allowing him to correct his bid. It is in the City's interest to obtain as many bids as possible rather than denying an opportunity to submit a corrected bid. Plaintiff himself was allowed to withdraw his bid and submit a second, higher bid. Thus, both a Hispanic and an African-American were allowed to submit a second bid. While Plaintiff may believe that a bidder should not have been able to correct a nonconforming bid by submitting a conforming bid, Plaintiff has not shown that that the decision to allow Bustos to do so, if that in fact occurred, was racially discriminatory to Plaintiff or African-Americans in general. Even if this was improper procedure, which the Court does not decide, that does not make it an FHA violation. The proper remedy is a suit filed in state court challenging whether the sealed bid procedures conformed to the requirements of the Texas Local Government Code and/or common law.

Third, the Bid Summary indicates that another Hispanic bidder (Frias) was marked as nonconforming for failing to place the parcel number on the outside, so one Hispanic bidder was given the same treatment as the African-American bidder Banks. Thus, the theory that

Hispanic nonconforming bids were given preferential treatment over African-American nonconforming bids is not borne out.

Further, to the extent Plaintiff alleges that Bustos was given preferential treatment because he received inside information to use market value, Plaintiff provides no evidence supporting his assertion that Casias gave Bustos this information because of his race or wanted Bustos to outbid Plaintiff because of his race. Although Roberts did tell Plaintiff to use the BCAD value, the undisputed evidence is that Roberts told anyone who asked, including Owen, this same information, and thus there is no indication that Roberts gave preferential treatment based on race. The evidence shows at most that Casias told one bidder, who happens to not be African-American, to use market value, but this does not establish racially discriminatory intent.

More importantly, this alleged discriminatory treatment was not a significant factor in bringing about Plaintiff's loss of the sale since he obtained the same information and still bid significantly less than Bustos. Plaintiff heard the conversation, which was apparently conducted out in the open rather than in secret, and thus Plaintiff also received the same information, albeit indirectly. Receiving this information prompted him to submit his second bid, and he thus had the information to determine the second bid amount, which he submitted believing that Bustos was also submitting a new bid. Even with the same information to use market value, however, Plaintiff submitted a revised bid that was over $6000 less than Bustos's bid. Although Plaintiff asserts that it was not his highest bid, perhaps because he believed he could get Bustos's bid disqualified as improper, that is not a basis for relief for race discrimination under the Fair Housing Act.

Further, even if Bustos's bid was submitted on December 22 and thus should not have been considered, for a jury to find for Plaintiff on his racial discrimination claim, the jury must find that Casias, Roberts, and Schnall all agreed to treat Bustos's bid as conforming even though it was late. But again there is no evidence that any of them acted with racially discriminatory intent in doing so, or that they rejected an African-American bid as untimely while giving preferential treatment to Bustos for the same defect. There is no similarly situated bidder to serve as a comparator for disparate treatment. The evidence shows at most that one bid was accepted late, and the fact that that bidder happened to be Hispanic does not establish racial discrimination against African Americans. And ultimately, the decision to award the sale to Bustos was made by the City Council, which Plaintiff alleges relied on Schnall's spreadsheet. Any discriminatory intent on the part of Casias, Roberts, and Schnall cannot be imputed to the City Council, as there is no indication that Plaintiff told them Bustos had submitted a late bid and that he was allowed to do so because of race.

Moreover, even if Bustos's bid had been rejected as nonconforming, Plaintiff fails to dispute the evidence that his bid would have been rejected because it was lower than the Stouffer appraised value. Thus, even if Bustos had not bid and had not been given any of the preferential treatment alleged, Plaintiff fails to establish that race was a significant factor in his loss of the sale of Parcel 5. He would have lost it anyway.

With regard to Owen, who Plaintiff alleges was given preferential treatment because his bid was nonconforming for failing to indicate the parcel number but was treated as conforming, Plaintiff again cannot show disparate treatment as to himself because he did not submit a nonconforming bid. Thus, Plaintiff again must rely on Banks. Even assuming that

29

Schnall incorrectly noted Owen's bid as conforming when it was not, this shows preferential treatment as against Banks (African-American) but also against Frias (Hispanic). This is inconsistent with Plaintiff's theory that Hispanics were given preferential treatment in the process. Further, any alleged preferential treatment concerning Owen's bid was not a significant factor in the denial of the sale to Plaintiff, because the sale was not awarded to Owen and Owen's bid was lower than Plaintiff's bid in any event. Moreover, since Plaintiff contends that the City Council never saw the original bids and simply relied on Schnall's bid summary, they were presumably unaware of any issues with Owen's bid at the time they voted, and thus any discriminatory intent by Schnall cannot be imputed to the City.

Thus, Plaintiff's allegations fail to demonstrate that Plaintiff was subjected to discriminatory treatment based on race that was a significant factor in the City's decision to deny him the sale and award it to Bustos. Even assuming that some bidders were treated differently, there is no basis from which a jury could conclude that any differential treatment was because of race. Nor is there sufficient evidence for a jury to conclude that race was a significant factor in Defendants' actions, or that any disparate treatment based on race was a causal factor in Plaintiff being denied the sale of Parcel 5. [10]

---

[10] Although proof of discriminatory motive may sometimes be inferred from the mere fact of differences in treatment, *Int'l Broth. Of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977), the allegations of disparate treatment in this case, which rely primarily on alleged disparate treatment of another individual (Banks) rather than Plaintiff and involve several different actors are insufficient to raise a plausible inference of racial discrimination. Plaintiff does not challenge Defendants' assertion that Bustos was awarded the bid because the City had decided to use the Stouffer value as a minimum; rather he complains only that this criterion was secret and asserts what he perceived to be unfair differences in treatment among the various bidders. Although he attributes these differences in treatment to racial discrimination, there is simply no plausible basis for such an inference when one examines the facts closely. Even when considering the *Arlington Heights* factors and the totality of circumstances, the evidence fails to give rise to an inference of discriminatory intent. And even if bidders were treated differently, none of this different treatment gave rise to a discriminatory effect, as neither Plaintiff nor Banks submitted a winning bid (*i.e.*, the bid did not exceed the Stouffer value).

There may have been some issues with the way that the City or certain individuals handled matters, and to the extent Plaintiff asserts that proper bid procedures were not followed, such claims are more properly addressed in a state court action to address alleged violations of state laws and procedures. A City's decision may be unsound, unfair, or even lawful, yet not violate the Fair Housing Act if there is no evidence that race was a significant factor in the City's decision. *Artisan/American Corp.*, 588 F.3d at 296.

### Section 1983 Discriminatory Ballot Access Claim

In early February 2017, Plaintiff decided to run for Selma City Council in the May 6, 2017 general election. Specifically, Plaintiff wanted to run for Place Four, a position occupied by incumbent Kevin Hadas (Caucasian). Hadas was aware that Plaintiff had submitted an election packet because Casias told him. Hadas depo. at 37. Because Plaintiff was unfamiliar with the process for appearing on the ballot, he requested that Casias's office provide copies of ballot applications that had already been submitted.[11] Casias states that the applications could not be provided right away because the City Attorney had made clear that dates of birth are confidential and should not be disclosed. Casias Aff. at 3. Casias states that Plaintiff submitted a formal open records request, and in response Norman Wyatt Agee from Casias's office provided the records, but with redacted dates of birth. Casias Aff. at 3; Del Toro Aff. at 2. The copies provided to Plaintiff redacted the candidates' dates of birth without indicating that information had been redacted or otherwise making it clear on the records that the information was redacted (it was only a white space in the date-of-birth field).

After Plaintiff announced his intention to run, Casias's office provided him with an informational letter regarding the election calendar and filing deadlines. Pl. Ex. 19; Casias Aff.

---

[11] Ken Roberts retired in December 2015, and Casias replaced Roberts as City Administrator in January 2016.

at 3. It indicated that Plaintiff could qualify to appear as a candidate on the ballot by submitting an application with the City Secretary's office no later than 5 p.m. on Friday, February 17, 2017 or that he could appear as a write-in candidate by submitting an application form with the City Secretary no later than midnight on Tuesday, February 21, 2017. The midnight deadline for the write-in application was not accurate, as the actual deadline was 5 p.m. or close of business. Casias depo. at 57. This same letter was given to all applicants. Casias depo. at 58.

Plaintiff complains that he did not receive the copies of the applications until around February 17, the date applications were due. Crain depo. at 74, 76. It is undisputed that Plaintiff submitted his ballot application, but without his birthdate, to Deputy City Secretary Rebecca Del Toro prior to the 5 p.m. deadline on February 17. Pl. Ex. 20. Del Toro is Casias's mother-in law and works under his ultimate (but not direct) supervisory authority.  Casias depo. at 54, 66; Parma depo. at 15. Del Toro states that she received the application at 4:47 p.m. Del Toro Aff. at 2.

The undisputed evidence is that Plaintiff was the only ballot applicant who submitted an application without a birthdate. Casias Aff. at 3; Hadas depo. at 41; Del Toro Aff. at 2. Plaintiff asserts that, before handing in his application, Plaintiff asked Del Toro whether he needed to provide his date of birth on the application, and she assured him it was not necessary. It does not appear from the evidence, however, that he actually brought to her attention specifically that his birthdate was missing. Rather, he testified that he asked, "Do I submit it just like this?" and she nodded yes. Crain depo. at 75, 76; Pl. Ex. 27 (transcript, "So I asked Rebecca del Toro . . . 'Do I do it just like this?' She says, 'Yes.'"). Del Toro then

notarized and accepted the application. Casias testified that it is not required that Del Toro review the applications with the candidate to verify that it is complete and accurate. Casias 2018 depo. at 62.

Del Toro's affidavit states that "upon her review" of the application, she noticed it did not include a birthdate or indicate the place sought and brought it to the attention of Casias. Del Toro Aff. at 2. There is no indication of when this occurred in the Affidavit, but she did not inform Plaintiff of any potential problems that day. The evidence indicates that Del Toro contacted Andrew Montgomery of the Secretary of State's office "late Friday afternoon" about the missing information. Pl. Ex. 22. He confirmed that a missing date of birth and missing place sought were defects that made the application ineligible, and Del Toro made Casias aware of Montgomery's opinion.

On Tuesday, February 21, Casias followed up with the Secretary of State's office about whether the application was invalid (Del Toro was out of the office that day) and, if so, if the Secretary of State could provide something in writing, and what steps the City should take. Pl. Ex. 22. The Secretary of State's office responded that failure to include a birthdate would be fatal, but noted that the deadline for filing as a write-in candidate was 5 p.m. that day. The Secretary of State also noted that the City has five days from the date the application was received to review the application, and if it does not meet the Code requirements (such as for missing a birthdate), the City must notify the candidate in writing. Pl. Ex. 22.

Plaintiff was notified on February 21 that his application was disqualified, but was told there was still time to file a declaration of write-in candidacy by the 5 p.m. deadline. Casias depo. at 76. As noted, although the write-in candidacy deadline was 5 p.m. February 21,

Plaintiff (and other candidates) had been given an information sheet by Casias's office stating a midnight deadline. Casias notified Plaintiff by email (and copy by certified mail) in the afternoon (approximately 2 p.m.) on February 21 that "there were some discrepancies that were discovered in your application . . . noted in the attachment to this email." Plaintiff responded that his application was the same as Hadas's application. Pl. Ex. 23. Plaintiff attempted to submit a corrected copy of his application with the birthdate included, but Casias inquired with the Secretary of State and was told that changes to the application past the deadline could not be allowed. Pl. Ex. 23.

Plaintiff then prepared a write-in candidacy application and attempted to deliver it to Casias's office after 5 p.m. Although the information sheet had stated that write-in applications were due by midnight, City Hall was closed and neither Casias nor any of his subordinates were available to receive the application. Casias 2018 depo. at 71-72. Plaintiff went to the United States post office and mailed his application, obtaining a post mark of 11:14 p.m. on February 21. Pl. Ex. 24. He also emailed a copy of the documents to Casias. The mailed write-in application was received at City Hall on February 23. Casias states the write-in declaration was deficient because it was late and was not notarized. Casias Aff. at 4.

Casias inquired with the Secretary of State's office about the ballot application's validity, based both on the lack of birthdate and on whether Crain had adequately indicated the place number. Casias depo. at 69-72. On February 23, the Secretary of State indicated that Crain had adequately indicated the place number but stated that an application must be rejected if it fails to contain the candidate's date of birth. Pl. Ex. 22; Def. Ex. L. The Secretary of State's email further stated that the 5 p.m. deadline on Tuesday, February 21 to file a

declaration of write-in candidacy is a hard "in hand" deadline and not a "mailed by" deadline. Pl. Ex. 22. It also stated that the declaration may not be emailed. *Id.* It does not appear that the Secretary of State was informed about the fact that Del Toro had accepted the application despite Plaintiff's question or that Casias had provided an incorrect midnight deadline for write-in declarations.

After Casias refused to certify Plaintiff's ballot or write-in applications, Plaintiff informed Mayor Daly and the City Council of his concerns about Casias's behavior. Pl. Ex. 25 (Plaintiff email to Mayor Daly, Casias, Del Toro that he has some concerns that he will be forwarding soon). At some point, Casias sent an email to the City Council members about the issue and said there were problems with Plaintiff's paperwork. Parma depo. at 10-11. Casias may have made the Council aware that Plaintiff was asserting discrimination, but Councilmember Parma stated that they were following Secretary of State guidance and he did not personally investigate the discrimination complaint. Parma depo. at 11-2. Parma testified it would have been the Mayor's responsibility. Parma depo. at 12.

Casias confirmed at the City Council's March 9, 2017 meeting that he had rejected Plaintiff's attempt to qualify as a write-in candidate. Casias summarized his email conversations with the Secretary of State's office for the Council, but did not inform Council that Crain had asserted that Del Toro had told him he did not need to include his birthday. Parma depo. at 13-14. Parma testified that would expect that allegation to be dealt with by the City Administrator (Casias). Parma depo. at 14.

On March 9, the City Council passed an ordinance canceling the 2017 election as uncontested and unnecessary, and no one investigated Crain's allegations. Pl. Ex. 26

(ordinance); Daly depo. at 34-36; Parma depo. at 16, 26. Mayor Daly testified that it was Casias's responsibility and he told Daly that he went to the state and made sure they were not doing anything against the law. Daly depo. at 36.

<u>Analysis</u>

Defendants move for summary judgment on Plaintiff's equal protection claim relating to his failure to be placed on the May 2017 ballot. Plaintiff asserts both a traditional race-based equal protection claim and a "class of one" equal protection claim related to his failure to be placed on either the traditional ballot or to be allowed to proceed as a write-in candidate. Casias also asserts qualified immunity on the basis that there was no constitutional deprivation or violation of rights because Plaintiff failed to properly fill in the ballot application and his write-in declaration was untimely. Docket no. 107 at 17.

Because the City has no express racial classification and Plaintiff has no direct evidence of racial animus, his claim is based on disparate treatment discrimination or selective enforcement. Plaintiff acknowledges that his race discrimination claim requires him to prove that he "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from discriminatory intent." Docket no. 109 at 14 (citing *Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004)); *see also Da Vinci Inv., Ltd. P'ship v. City of Arlington, Tx.*, 747 F. App'x 223, 227 (5th Cir. 2018) ("Under a 'class of one' Equal Protection claim, a plaintiff must allege that he/she has been intentionally treated differently from others similarly situated and that there was no rational basis for the differential treatment."); *Stout v. Vincent*, 717 F. App'x 468, 471-72 (5th Cir. 2018) ("'To state a claim of racial discrimination under the Equal Protection Clause and section 1983, the

plaintiff must allege and prove that [she] received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.'"")).

This Court previously denied summary judgment on this claim based on Plaintiff's allegation that "non-Black candidates also failed to fully complete their applications and omitted their dates of birth, but nevertheless were allowed to be place on the ballot." Docket no. 73 at 5. But the summary judgment evidence has proved this to be untrue. The Court expressly denied the motion without prejudice, noting it would revisit the issue if the City could show that the original applications from non-African American candidates did have their birthdates. Pl. Ex. 27 at 25. Defendants have now provided sufficient, uncontroverted summary judgment evidence to show that the three other candidates all included their birthdates on their applications. Plaintiff was the only applicant who did not. The lack of a similarly situated comparator is fatal to both his traditional and "class of one" equal protection claims.

Further, Plaintiff points to no other candidate who submitted an untimely write-in declaration who received preferential treatment. While Plaintiff notes, correctly, that Plaintiff experienced certain unfavorable and misleading treatment, and that only he was subjected to this treatment, he fails to provide a similarly situated comparator for any of that treatment. Plaintiff complains that he requested the other candidates' applications, but was not given them immediately. The City has provided an explanation for this – that it believed that records with confidential information such as birthdates could not simply be provided upon demand. Plaintiff then filed an Open Records Request, and was given the applications, but with

birthdates redacted and without any indication that such redaction had occurred. There is no indication that any other candidate filed a similar request and was given unredacted copies or was told about the redaction. Plaintiff contends that because "Casias and his subordinates did not violate the Texas Public Information Act with respect to any other candidates, this constitutes disparate treatment." Docket no. 109 at 15.[12] But it constitutes disparate treatment only if another candidate made a similar TPIA request and was treated differently. The burden of showing that another candidate did so, and was similarly situated but given preferential or different treatment, rests with the Plaintiff. The fact that no such other comparators may exist does not excuse Plaintiff from his burden.

Similarly, although Plaintiff asked Del Toro if he should file his application "just like this?", there is no evidence that any other potential applicant was given different information. Although Casias may have been aware of the defect on the afternoon of Friday the 17th, and did not inform Plaintiff until the afternoon of the 21st, there is no indication that Casias was aware of any defects in another candidate's application yet acted more swiftly.[13] Although Plaintiff was denied the opportunity to submit his write-in declaration before midnight on February 21, there is no candidate who attempted to submit an untimely application who was

---

[12] The parties dispute whether the TPIA requires that the City redact birthdates on applications. It is not necessary for the Court to decide this issue because even if the City violated the TPIA, that violation itself is not actionable as a claim in federal court, and there is still no evidence of disparate treatment.

[13] Monday the 20th was a holiday, and thus Casias informed Plaintiff of the defect on the next business day, after conferring with the Secretary of State's office. Plaintiff argues that the Texas Election Code § 141.032(e) required Casias to inform Plaintiff of the defect "immediately" and therefore the same date that he learned of the defect, and because Casias and Del Toro did not violate the Code with respect to any other candidate, this is disparate treatment. But again, there is no similarly situated comparator to establish disparate treatment, and a violation of the Election Code standing alone is not sufficient (assuming without deciding that any violation occurred). Plaintiff contends that the City had five days to review the application and inform Plaintiff of the defect, and appears to believe that this means he had five days to cure the defect, even after the deadline. The Court is doubtful that this is correct, but in any event need not decide this issue because, again, there is no similarly situated comparator who received favorable treatment.

permitted to proceed as a write-in candidate, and the evidence shows that all candidates were given the same incorrect information about a midnight deadline.

The fact that Plaintiff was the only African-American candidate and the fact that he may have received certain false or misleading information, while perhaps demonstrating certain errors on the part of City actors, is not sufficient to survive summary judgment on a disparate treatment equal protection claim and a class of one claim. Further, a plaintiff's subjective belief that discrimination occurred, however genuine, cannot be the basis for relief and is inadequate to survive summary judgment. *Stout v. Vincent*, 717 F. App'x 468, 472 (5th Cir. 2018). Although the circumstances are unfortunate, and although Plaintiff was harmed in being denied a place on the ballot, Plaintiff's claim that he was discriminated against on the basis of his race in relation to the denial cannot survive summary judgment.

Because there is no underlying constitutional violation, the individual defendants are entitled to qualified immunity, and there is no basis for *Monell* liability against the City of Selma. Accordingly, summary judgment is granted as to Defendants on Plaintiff's claims arising out his failure to be placed on the May 2017 City Council election.

## Conclusion

Defendants' motion for summary judgment (docket no. 107) is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE. The Clerk shall enter Judgment that Plaintiff take nothing by his claims, and that all claims are DISMISSED WITH PREJUDICE.

Defendants, as prevailing parties, may file a bill of costs pursuant to the local rules. Plaintiff's counsel, appointed by the Court, may seek reimbursement for any costs incurred by submitting a claim pursuant to the Order Adopting Amended Plan for the Payment of Attorney

Fees and Reimbursement of Attorney Expenses in Civil Cases, available on the Court's website. Appointed counsel is otherwise relieved from any further obligation.

It is so ORDERED.

SIGNED this 29th day of April, 2019.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE